James BROGDON, individually, and by next friend Suzie Cline, et al., Plaintiffs,

v.

NATIONAL HEALTHCARE CORPO-RATION, d/b/a NHC Healthcare of Ft. Oglethorpe, NHC/OP, L.P., d/b/a NHC Healthcare of Ft. Oglethorpe, Defendant.

No. CIV.A. 4:99CV0313HLM.

United States District Court,
N.D. Georgia,
Rome Division.

May 17, 2000.

Order Modifying Opinion on Denial of Reconsideration June 26, 2000.

William Dufour deGolian, Johnson & Ward, Atlanta, GA, Phyllis J. Holmen, Lisa Jane Krisher, Georgia Legal Services Program, Atlanta, GA, David LeBron McGuffey, Coppedge Leman & Ward, Dalton, GA, James W. Clements, III, phv, Kennedy Fulton Koontz & Farinash, Chattanooga, TN, Torin Dana Togut, Office of Torin D. Togut, Roswell, GA, Lance Douglas Lourie, Stephen Roberts Chance, Watkins Lourie & Roll, Atlanta, GA, for Plaintiffs.

William Wray Eckl, Barbara Anne Harding, Drew Eckl & Farnham, Atlanta, GA, Michael W. McElroy, H. Andrew Owen, Jr., William R. Cowden, phv, David J. George, phv, Harman Owen Saunders & Sweeney, Atlanta, GA, Malcolm J. Harkins, III, phv, Margaret J. Babb, phv, Washington, DC, for Defendants.

## ORDER

MURPHY, District Judge.

This case involves federal and state law claims by present and deceased residents of a long-term health care facility alleging that Defendants have failed to provide ba-

sic and minimally required levels of care. The case is before the Court on Defendant's Motion to Dismiss [12].

## I. Background

When considering a motion to dismiss, all well-pleaded facts set forth in the plaintiff's complaint "are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto." *GSW, Inc. v. Long County,* 999 F.2d 1508, 1510 (11th Cir.1993); *accord Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1273 n. 1 (11th Cir.1999).

Plaintiffs are residents of the State of Georgia. (Compl.¶ 7.) Defendant National Healthcare Corporation is a Delaware corporation with its principal place of business located in the State of Tennessee. (*Id.* ¶ 1.) Defendant NHC/OP, L.P., is a Delaware limited partnership with its principal place of business located in the State of Tennessee.

Defendants own and operate a long term health care facility, NHC of Ft. Oglethorpe, in Fort Oglethorpe, Georgia. (*Id.* ¶ 5.) The facility has the capacity to house approximately 133 residents. (*Id.* ¶ 41.)

Plaintiffs are present and former residents of the facility. (*Id.* ¶ 11.) Plaintiffs Mixon Smith, Louvena Leroy, William E. Chasteen, Sr., Glen Rucks, Obbon L. Baldwin, Lou Ellen Slayback, and James L. Erickson, Sr., resided at the facility before their deaths. Plaintiffs allege that they suffer or suffered from inhumane conditions at the long term health care facility owned and operated by Defendants.

Defendants employ nurses and certified nursing assistants ("CNAs") to provide care and treatment to the residents. (*Id.* ¶ 42.) There is a high rate of turnover among the nursing staff at the facility. (*Id.* ¶ 44.) The CNAs are paid minimum hourly wages or wages that are slightly higher than the minimum permitted by law. (*Id.* ¶ 43.) The CNAs at the facility are also poorly trained and poorly supervised. (*Id.* ¶ 45.) Because of the high turnover, the low wages, and poor training and supervision, Plaintiffs are abused and neglected at the facility. (*Id.* ¶ 47.) The nursing staff also fail to respond to Plaintiffs' complaints in a timely fashion, and do not sufficiently meet the social and emotional needs of Plaintiffs. (*Id.* ¶¶ 50–51.)

Furthermore, the food served to Plaintiffs lacks nutritional value. (*Id.* ¶ 48.) Additionally, Defendants fail to provide substitute diets for Plaintiffs who have particular dietary needs. (*Id.* ¶ 49.)

Plaintiffs therefore allege that the staff at the nursing home fails to provide for Plaintiffs' safety, health, and well-being. (*Id.* ¶ 51.) Additionally, Defendants fail to take appropriate remedial measures to enforce federal and state laws and regulations or satisfy contractual obligations to Plaintiffs. (*Id.* ¶ 53.) Furthermore, Defendants bill for services which have not been sufficiently provided. (*Id.* ¶ 54.) For these reasons, Plaintiffs allege that their health and safety are in serious jeopardy. (*Id.* ¶ 55.)

Specifically, Defendants have failed to provide adequate nursing care to Plaintiffs who are incapable of performing basic daily living skills. (*Id.* ¶¶ 59–60, 71, 76, 86, 91, 96, 101, 110, 115; First Am. Compl. ¶ 117C; Second Am. Compl. ¶ 117P.) Nursing staff at the facility also neglected to properly care for Plaintiff Smith by failing to timely recognize that Plaintiff Smith had suffered a hip fracture. (Compl.¶ 65.)

Pursuant to a contract with the Georgia Department of Community Health, Division of Medical Assistance, Defendants must provide skilled nursing services, long-term care, treatment, and other Medicaid services to Plaintiffs. (*Id.* ¶ 147.) NHC of Ft. Oglethorpe has allegedly breached this contract by failing to comply with the minimum standards of care required under state and federal laws and regulations. (*Id.* ¶ 150.)

One or more Plaintiffs, including Plaintiff LeRoy, entered into a written contract with Defendants upon admission to Defendants' facility. (*Id.* ¶¶ 152–53.) The con-

tract is entitled "Admission and Financial Contract TG 200." (*Id.* ¶ 152.) Under this contract, Defendants agreed to provide food services, professional nursing services, social services, activities, restoration services, physical therapy, occupational therapy, speech therapy, beauty shop services, barber services, daily housekeeping, and laundry services. (*Id.* ¶ 154.) Defendants also agreed to provide nursing services in accordance with the nursing standard of care. (*Id.* ¶ 155.) Defendants have allegedly failed to provide these services to Plaintiffs. (*Id.* ¶¶ 156–57.)

On November 15, 1999, Plaintiffs filed their initial Complaint. Plaintiffs' initial Complaint includes twelve counts, asserting the following claims for relief:

1. Violation of Federal standards required for participating nursing homes under 42 U.S.C.A. § 1395i–3 (Medicare);

2. Violation of Federal standards required for participating nursing homes under 42 U.S.C.A. § 1396r (Medicaid);

3. Violation of state standards required for nursing homes under the Georgia Bill of Rights for Nursing Home Residents, O.C.G.A. § 31–8–100 *et seq.;*

4. Negligent Hiring and Retention;

5. Nursing Aide and Nursing Malpractice and Neglect;

6. Wrongful Death;

7. Third Party Beneficiary Breach of Contract;

8. Breach of Contract;

9. Unfair or Deceptive Practices Toward Elderly;

10. Punitive Damages;

11. Preliminary and Permanent Injunctive Relief;

12. Declaratory Judgment.

(Compl.¶¶ 118–174.) Plaintiffs requested a preliminary injunction, including the appointment of a special master, pursuant to the federal standards enumerated under the Medicare and Medicaid Acts. Plaintiffs also requested a preliminary injunction un-

der Georgia law, and have included a general prayer for preliminary and permanent injunctive relief in count eleven of the initial Complaint. On December 30, 1999, Plaintiffs filed their first Amended Complaint, in which Plaintiffs added a claim for attorneys' fees pursuant to O.C.G.A. § 13–6–11.

On February 4, 2000, Defendants filed the instant Motion to Dismiss. Defendants have not yet filed an Answer to Plaintiffs' Complaint.

On February 25, 2000, Plaintiffs filed a Motion for Preliminary Injunction. On April 3, 2000, Defendants filed their Response to Plaintiffs' Motion for Preliminary Injunction. On April 26, 2000, Plaintiffs filed their Reply Brief. On April 28, 2000, the Court scheduled a hearing with respect to Plaintiffs' Motion for Preliminary Injunction to begin on May 9, 2000. On May 9, 10, and 11, 2000, the Court heard testimony related to Plaintiffs' Motion for Preliminary Injunction. The hearing is scheduled to resume on May 24, 2000, at 9:30 a.m.

## II. Discussion

The standard for a court to dismiss a claim is whether "it appears beyond doubt that the plaintiff can prove no set of facts to support his claim." *GSW, Inc. v. Long County,* 999 F.2d 1508, 1510 (11th Cir. 1993) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). When considering a motion to dismiss, the Court considers all well-pleaded facts set forth in the plaintiff's complaint as true. *Hall v. Coram Healthcare Corp.,* 157 F.3d 1286, 1287 (11th Cir.1998).

### A. Counts One and Two: The Medicare and Medicaid Acts

■ Plaintiffs assert claims pursuant to the Medicare and Medicaid Acts. As the Court ruled at the hearing on May 11, 2000, the Medicare and Medicaid Acts do not provide a private cause of action for residents of nursing homes to sue the owners or operators of nursing homes. In accordance with the following discussion,

the Court therefore grants Defendants' Motion to Dismiss with respect to counts one and two of Plaintiffs' initial Complaint.

## 1. Purpose and Design

The Medicare Act, established pursuant to Title XVIII of the Social Security Act, 42 U.S.C.A. § 1395 *et seq.*, is a federal program designed to provide health insurance for aged and disabled persons. § 1395c, 1395d. The Health Care Financing Administration ("HCFA"), an agency within the Department of Health and Human Services, oversees the implementation of this program. *See United States v. Blue Cross & Blue Shield of Ala., Inc.*, 156 F.3d 1098, 1100 n. 3 (11th Cir.1998).

The Medicaid Act, established pursuant to Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 *et seq.*, is a joint program funded by both the federal and state governments designed to provide medical assistance to certain persons in need. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The Medicaid Act is administered by the individual states that choose to participate in the program. If a state participates in the program, the state must comply with the requirements of the Medicaid Act and its implementing regulations. *See* 42 U.S.C.A. § 1396a; 42 C.F.R. §§ 430 *et seq.; Wilder*, 496 U.S. at 502, 110 S.Ct. 2510. All fifty states have chosen to participate in the program.

The Medicare and Medicaid programs both authorize the payment of federal funds to reimburse nursing facilities for certain services provided to their residents. To qualify for reimbursement, a facility must be certified to participate in the programs. To be certified under the Medicare program, a facility must comply with various requirements set forth at 42 U.S.C.A. § 1395i–3(b)–(d), and the federal regulations found in 42 C.F.R. § 483.1 *et seq.* To be certified under the Medicaid program, a facility must comply with various requirements set forth at 42 U.S.C.A. § 1396r(b)-(d), and the federal regulations

found in 42 C.F.R. § 442.1, *et seq.* State survey agencies typically are responsible for conducting inspections of the facilities to ensure their compliance with the participation requirements. 42 U.S.C.A. §§ 1395i–3(g)(1)(A); 1396r(g)(1)(A).

## 2. 1987 Amendments

Before Congress amended the Medicare and Medicaid Acts in 1987, only two sanctions were available against nursing homes for noncompliance with federal participation requirements. First, the Secretary of Health and Human Services or the States could decertify the facility and terminate the nursing home from eligibility to receive Medicaid reimbursements. H.R.Rep. No. 100–391, at 471 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–290. Second, if non-compliance was not an immediate and serious threat to the residents' health and safety, the Secretary or the States could deny payment for new admissions for up to eleven months. *Id.*

These sanctions were rarely invoked. *Id.* at 471, reprinted in 1987 U.S.C.C.A.N. at 2313–291. As a result, the programs permitted too many substandard nursing homes to continue in operation. Congress thus became "deeply troubled that the Federal government, through the Medicaid program, continue[d] to pay nursing facilities for providing poor quality care to vulnerable elderly and disabled beneficiaries." *Id.* at 452, reprinted in U.S.C.A.A.N. at 2313–272.

In 1987, Congress passed the Federal Nursing Home Reform Act ("FNHRA"), contained in the Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"), Pub.L. No. 100–203, §§ 4201–4218, 1987 U.S.C.C.A.N. (101 Stat.) 1330, 1330–160 to –221 (codified at 42 U.S.C.A. §§ 1395i–3, 1396r), which provides for the oversight and inspection of nursing homes that participate in Medicare and Medicaid programs. The OBRA '87 amendments require that participants must be subjected to an unannounced "standard survey" at least once every fifteen months. 42 U.S.C.A. § 1395i–3(g)(2)(A).[1] If a stan-

---

**1.** "Any individual who notifies (or causes to be notified) a nursing facility of the time or

dard survey reveals that a nursing home is providing substandard care, the facility must undergo an "extended survey." 42 U.S.C.A. § 1395i–3(g)(2)(B). The requirements for certification include satisfying certain standards in areas such as "quality of care" and "resident rights." 42 U.S.C.A. §§ 1395i–3(g), 1396r(g).

Additionally, the OBRA '87 amendments include a number of intermediate sanctions to encourage compliance with federal participation requirements. Specifically, Congress allowed for the denial of payments for all Medicare beneficiaries and all newly admitted Medicaid beneficiaries, civil monetary penalties under both Medicaid and Medicare for each day of non-compliance (not to exceed $10,000 for each day of noncompliance under Medicare), appointment of temporary management, and, under Medicaid, closure of the nursing home and transfer of residents to other facilities. 42 U.S.C.A. §§ 1395i–3(h)(2)(B); 1396r(h)(2)(A), (h)(3). These enforcement measures are implemented by the Secretary of Health and Human Services and state governments. *See, e.g., United States v. Northern Health Facilities, Inc.,* 25 F.Supp.2d 690 (D.Md.1998).

### 3. Administrative Review, Standing and Primary Jurisdiction

Defendants argue that Plaintiffs must first present their claims under the Medicare Act through an administrative process before seeking judicial relief. Defendants also argue that Plaintiffs lack standing to assert claims under the Medicaid Act, and that the Georgia State Department of Community Health has primary jurisdiction with respect to Plaintiffs' claims related to payments under Medicaid. The Court rejects these arguments.

### a. Administrative Review under Medicare

The Court is not authorized to address claims against the United States, the Secretary of Health and Human Services, or their officers and employees, that arise

date in which such a survey is scheduled to be conducted is subject to a civil money penalty of not to exceed $2,000." 42 U.S.C.A.

under the Medicare Act until after the conclusion of an administrative review process. *See* 42 U.S.C.A. § 1395cc(h) (referencing 42 U.S.C.A. § 405(g), which permits judicial review following administrative hearing and final decision by Secretary of Health and Human Services); 42 U.S.C.A. § 405(h) (eliminating federal question jurisdiction for claims arising under Medicare Act); *see also Shalala v. Illinois Council on Long Term Care, Inc.,* — U.S. —, —, 120 S.Ct. 1084, 1097, 146 L.Ed.2d 1 (2000) (holding that nursing homes' challenge to constitutionality of standards used to determine that homes failed to comply with Medicare participation requirements must first be presented in administrative review process); *Your Home Visiting Nurse Servs., Inc. v. Shalala,* 525 U.S. 449, 456, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999) ("judicial review under the federal-question statute, 28 U.S.C. § 1331, is precluded by 42 U.S.C. § 405(h)"); *Heckler v. Ringer,* 466 U.S. 602, 615, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (" § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act.").

Plaintiffs do not assert claims against the United States, the Secretary of Health and Human Services, or their officers or employees. Furthermore, the Medicare Act contains no administrative review process that applies to Plaintiffs' claims. The Court therefore rejects this argument.

### b. Standing and Primary Jurisdiction under Medicaid

Defendants argue that Plaintiffs lack standing because "[t]here is no mechanism under the regulations to allow plaintiffs to assert their Medicaid claims." (Defs.' Br. Supp. Mot. Dismiss at 8.) Defendants misapprehend the inquiry applied to appraise a plaintiff's standing to sue in federal court.

§ 1396r(g)(2)(A)(i); *see also* § 1395i–3(g)(2)(A)(i).

■ Standing is a constitutional and prudential doctrine designed to ensure that the party seeking relief has alleged a sufficient stake in the outcome of the controversy. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The question does not turn on the merits of the claims or whether the controversy is otherwise justiciable. *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153–54, 157–58, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

Defendants do not address the requirements of standing. Moreover, for present purposes the Court finds that Plaintiffs have alleged a sufficient causal connection between a perceptible injury to their interests and the challenged conduct of Defendants that is likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ The Court also rejects Defendants' argument that a state agency enjoys "primary jurisdiction" over Plaintiffs' claims. The doctrine of primary jurisdiction is designed to coordinate the relationship between federal courts and administrative agencies. *United States v. Western Pac. R.R.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Where an administrative agency and a court share concurrent jurisdiction, but resolution of the claim at issue falls within the peculiar competence of the agency, the court may stay further action to permit a plaintiff to apply for a ruling from the agency. *Reiter v. Cooper,* 507 U.S. 258, 268 n. 3, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *Hansen v. Norfolk & W. Ry.,* 689 F.2d 707, 710 (7th Cir.1982).

The Supreme Court first recognized the doctrine of primary jurisdiction in the context of the Interstate Commerce Act ("ICA"). *Texas & Pac. Ry. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). The ICA permitted plaintiffs to seek redress either in federal district courts or by making a complaint to the Interstate Commerce Commission ("ICC"). 49 U.S.C.A. § 9 (repealed 1978); *cf.* 49 U.S.C.A. § 11704(c)(1). The Court concluded, however, that questions related to the determination of just shipping rates should first be committed to the ICC. *Abilene Cotton Oil,* 204 U.S. at 440–41, 27 S.Ct. 350. Application of the doctrine of primary jurisdiction initially rested upon the need for uniformity with respect to certain administrative regulations. *Id.* Subsequently, the Court emphasized the specialized knowledge held by administrative agencies. *Western Pac. R.R.,* 352 U.S. at 64–65, 77 S.Ct. 161.

The question raised by Defendants' Motion to Dismiss is whether the statutory scheme imposed under the Medicaid Act requires the Georgia State Department of Community Health to pass on Plaintiffs' claims of lack of sufficient care. *Cf. Western Pac. R.R.,* 352 U.S. at 65, 77 S.Ct. 161 ("[T]he first question presented is whether effectuation of the statutory purposes of the Interstate Commerce Act requires that the Interstate Commerce Commission should first pass on the construction of the tariff in dispute here.").

■ Plaintiffs have no means by which to seek an administrative ruling, because no administrative complaint provision relates to Plaintiffs' claims.[2] In other words, Medicaid provides no scheme for administrative enforcement of Plaintiffs' claims, and no means by which Plaintiffs may seek an administrative ruling from the Georgia State Department of Community Health. *Wilder,* 496 U.S. at 521, 110 S.Ct. 2510 ("The Medicaid Act contains no comparable provision for private judicial or administrative enforcement."). The Georgia State Department of Community Health therefore does not share with the Court concurrent jurisdiction with respect to Plaintiffs' claims, much less enjoy primary jurisdiction. The Court thus denies Defendants' Motion to Dismiss based upon the doctrine of primary jurisdiction.

2. Administrative proceedings exist for individuals whose applications for medical assistance are denied by the Department of Medical Assistance. O.C.G.A. § 49–4–153.

### 4. Implied Cause of Action

Plaintiffs contend that residents of nursing homes may sue to enforce compliance with federal standards imposed under the Medicare and Medicaid Acts. These statutes, however, do not expressly authorize private causes of action to enforce their provisions.

■■■ Federal laws that do not explicitly authorize private causes of action may do so implicitly. Furthermore, actions for violations of federal law under 42 U.S.C.A. § 1983 are "presumptively available" against individuals acting under color of state law. *Livadas v. Bradshaw*, 512 U.S. 107, 133, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *cf. Doe v. Chiles*, 136 F.3d 709 (11th Cir.1998) (holding that developmentally disabled plaintiff may sue state official for violating Medicaid provision requiring state plan to provide medical assistance with "reasonable promptness"); *Harris v. James*, 127 F.3d 993, 1009–10 (11th Cir.1997) (finding that Medicaid recipients do not have enforceable federal right to transportation); *Ottis v. Shalala*, 862 F.Supp. 182, 187 (W.D.Mich. 1994) (discussing lawsuit to require implementation of enforcement procedures against noncomplying nursing homes). In fact, States bear the burden of showing that Congress intended to foreclose private enforcement of federal laws under § 1983. *Wilder*, 496 U.S. at 520, 110 S.Ct. 2510.

■■ In contrast, Plaintiffs bear the burden of establishing that Congress intended to create a private remedy under the Medicaid and Medicare Acts. *Suter v. Artist M.*, 503 U.S. 347, 363–64, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *see also Wilder*, 496 U.S. at 508–09 n. 9, 110 S.Ct. 2510 (distinguishing implied cause of action inquiry from that applied to § 1983 claims). To determine whether the Medicaid and Medicare Acts implicitly authorize private causes of action, the Court must examine: (1) whether the statutes were created for the plaintiffs' special benefit, (2) whether there is evidence of legislative intent to create a private remedy, (3) whether a private remedy would be consistent with legislative purposes, and (4) whether the area is one traditionally relegated to the states. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *see also Florida v. Seminole Tribe*, 181 F.3d 1237, 1246 (11th Cir.1999). "[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).

As an initial matter, the Court finds that the Medicare and Medicaid Acts were enacted to benefit recipients such as Plaintiffs. *Silver v. Baggiano*, 804 F.2d 1211, 1217 (11th Cir.1986). Moreover, it is equally clear that these programs may confer certain federal rights. *See Wilder*, 496 U.S. at 509–12, 110 S.Ct. 2510 (holding that Boren Amendment to Medicaid Act creates enforceable federal rights); *Doe*, 136 F.3d at 719 (finding that developmentally disabled plaintiff has a federal right to reasonably prompt provision of assistance pursuant to 42 U.S.C.A. § 1396a(a)(8)).

Even if plaintiffs enjoy certain federal rights, however, they may not necessarily possess a private cause of action to enforce those rights. *Seminole Tribe*, 181 F.3d at 1247. The question presented by Defendant's Motion to Dismiss is whether Congress intended to authorize nursing home residents to file suit against nursing homes to enforce the standards required for participation in the Medicare and Medicaid programs.

The Court concludes that Congress did not intend to create such a remedy. The great majority of courts have determined that the Medicare and Medicaid Acts do not authorize private causes of action against nursing homes. *See Wheat v. Mass*, 994 F.2d 273, 276 (5th Cir.1993); *Stewart v. Bernstein*, 769 F.2d 1088, 1092–93 (5th Cir.1985); *Estate of Ayres v. Beaver*, 48 F.Supp.2d 1335, 1339–40 (M.D.Fla. 1999); *Nichols v. St. Luke Ctr.*, 800 F.Supp. 1564, 1568 (S.D.Ohio 1992); *Chal-*

fin v. Beverly Enters., Inc., 741 F.Supp. 1162, 1170–71 (E.D.Pa.1989); *Fuzie v. Manor Care, Inc.*, 461 F.Supp. 689, 697 (N.D.Ohio 1977). *But see Roberson v. Wood,* 464 F.Supp. 983, 988–89 (E.D.Ill. 1979). These courts found nothing in the text or legislative history of the Medicaid or Medicare Acts before the OBRA '87 amendments to suggest that Congress intended to create a private cause of action. *See Stewart,* 769 F.2d at 1092–93; *Chalfin,* 741 F.Supp. at 1170–71.

An examination of the FNHRA does not alter this conclusion. First, the fact that the FNHRA speaks in terms of residents' rights, 42 U.S.C.A. §§ 1395i–3(c), 1396r(c), does not determine whether residents have a private cause of action, or even whether those "rights" are enforceable. *Pennhurst v. Halderman,* 451 U.S. 1, 18–19, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("bill of rights" provision of Developmentally Disabled Assistance and Bill of Rights Act essentially precatory and therefore unenforceable under § 1983).

Second, the legislative history of the FNHRA does not support a finding that a private cause of action exists. The Medicare and Medicaid Acts are programs that restrict the disbursement of funds pursuant to Congress' taxing and spending power. Incident to its spending power, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole,* 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst,* 451 U.S. at 17, 101 S.Ct. 1531.

The FNHRA amendments to Medicaid and Medicare must be considered in this context. Indeed, the House Report accompanying this legislation provides that the "central purpose of these amendments is to improve the quality of care for Medicaid-eligible nursing home residents, and either to bring substandard facilities into compliance with Medicaid quality of care requirements or to exclude them from the program." H.R.Rep. No. 100–391, at 452 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–272. Furthermore, the House Report notes that the Secretary of Health and Human Services and the States are responsible for enforcing the standards imposed upon participating facilities. *Id.* at 471, reprinted in 1987 U.S.C.C.A.N. at 2313–291. The House Report therefore indicates that Congress intended to further its policy objectives simply by attaching certain conditions to the receipt of federal money, conditions enforced by the Secretary and the States. *See Dole,* 483 U.S. at 206, 107 S.Ct. 2793.

The Court acknowledges that Congress did not intend to preclude residents from pursuing common law remedies. Indeed, both the Medicare and Medicaid statutes specify that the remedies provided "shall not be construed as limiting such other remedies, including any remedy available to an individual at common law." 42 U.S.C.A. §§ 1395i–3(h)(5), 1396r(h)(8). Similarly, the House Report provides that the FNHRA should not "be construed to limit remedies available to residents at common law, including private rights of action to enforce compliance with requirements for nursing facilities." H.R.Rep. No. 100–391, at 472, reprinted in 1987 U.S.C.C.A.N. at 2313–292. But these citations simply emphasize that Congress did not consider authorization of a private cause of action by federal statute. *Cf. Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 90, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) (distinguishing implied cause of action from one created under federal common law).

Plaintiffs cite *Cannon v. University of Chicago,* 441 U.S. 677, 699–700, 99 S.Ct.

1946, 60 L.Ed.2d 560 (1979), to support their claim that Congress intended to create a private cause of action in the Medicaid and Medicare Acts. In *Cannon,* the Supreme Court recognized an implied right of action under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C.A. §§ 1681 *et seq. See Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 639, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Unlike Title IX, however, the Medicare and Medicaid Acts were not modeled after another statute in which a private cause of action had already been implied. *Cf. Cannon,* 441 U.S. at 699–700, 99 S.Ct. 1946 (noting that Congress modeled Title IX after Title VI). Furthermore, in contrast to the statute at issue in *Cannon,* the Medicaid and Medicare Acts are not especially aimed at preventing discrimination. *See id.* at 708, 99 S.Ct. 1946 (noting that federal government and courts, not the States, have been primarily responsible for protecting individuals from discrimination). Here, the provisions at issue appear to be nothing other than components of "a typical funding statute." *Pennhurst,* 451 U.S. at 22, 101 S.Ct. 1531. The Court thus finds no indication that Congress intended to create a private cause of action under the Medicaid or Medicare Acts.

Notwithstanding the Court's appraisal of Congress' intent, the remaining factors identified in *Cort v. Ash* also inform the analysis of the existence of an implied right of action. In light of Congress' unambiguous desire to promote the standard of care provided to nursing home residents, and the statutory acknowledgment that other remedies may remain available, the Court is unconvinced that a private remedy would be inconsistent with the underlying legislative scheme. *But see Fuzie,* 461 F.Supp. at 697.

Nonetheless, the health and welfare of individuals is an area of legislation traditionally entrusted to the States. *City of Boerne v. Flores,* 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (noting that States enjoy "traditional prerogatives and general authority to regulate for the health and welfare of their citizens"); *Blue Cross & Blue Shield of Ala., Inc. v. Nielson,* 116 F.3d 1406, 1413 (11th Cir.1997) ("Adjustment of the rights and interests of insurers, health care providers, and insureds is a subject matter that falls squarely within the zone of traditional state regulatory concerns."). This consideration thus weighs against finding an implied cause of action.

In sum, the Court finds little evidence of Congress' intent to create a private cause of action that would entitle nursing home residents to sue nursing homes to enforce Medicare and Medicaid participation standards. The Court therefore grants Defendant's Motion to Dismiss with respect to counts one and two of Plaintiffs' initial Complaint.

### B. Count Three: Bill of Rights for Residents of Long–Term Care Facilities

█ Defendants argue that, unless otherwise specified in the statute, statutory claims do not survive the death of a plaintiff. For this reason, Defendants argue that count three should be dismissed with respect to Plaintiffs who are deceased.

The Court disagrees. O.C.G.A. § 9–2–41 specifies that "[n]o action for a tort shall abate by the death of either party, where the wrongdoer received any benefit from the tort complained of." This section provides "for the survival to the administrator of causes of action that exist in the deceased person before his death." *Gilmere v. City of Atlanta,* 737 F.2d 894, 898 n. 8 (11th Cir.1984) (quoting *Complete Auto Transit, Inc. v. Floyd,* 214 Ga. 232, 238, 104 S.E.2d 208 (1958)).

The violation of a duty imposed by statute, or a contract for that matter, may constitute a tort. *Waldrip v. Voyles,* 201 Ga.App. 592, 594, 411 S.E.2d 765 (1991). The Georgia legislature therefore need not address the issue of survival in each section of the Georgia Code that imposes an enforceable duty.

The Bill of Rights for Residents of Long–Term Care Facilities ("Long–Term

Care Bill of Rights") imposes enforceable duties upon operators of long-term care facilities. O.C.G.A. § 31–8–126. In fact, the Georgia Court of Appeals has addressed claims under the Long–Term Care Bill of Rights brought on behalf of plaintiffs who are deceased. *See Thurman v. Pruitt Corp.*, 212 Ga.App. 766, 766–67, 442 S.E.2d 849 (1994). The Court therefore denies Defendants' Motion to Dismiss with respect to this argument.

### C. Count Five

Count five of Plaintiffs' Complaint alleges a professional malpractice claim for failure to provide adequate nursing care. Defendants argue that this claim should be dismissed because Plaintiffs have failed to exhaust their claims, Plaintiffs lack standing, and no private cause of action exists to enforce standards imposed under the Medicaid and Medicare Acts.

For the reasons discussed *supra* Part II.A.3.a. and b., the Court rejects Defendants' first two arguments. As for the existence of a cause of action, the practice of nursing is recognized as a profession subject to its own general standards of care and qualifications. O.C.G.A. § 43–26–1 *et seq.* (registered nurses); *Candler Gen. Hosp. v. Joiner*, 180 Ga.App. 455, 456–57, 349 S.E.2d 756 (1986). Georgia law thus recognizes a professional malpractice cause of action for breach of the minimum standards of care by members of the nursing profession. *Thurman*, 212 Ga. App. at 768, 442 S.E.2d 849. Participation requirements under Medicare and Medicaid are relevant, of course, only to the extent that they relate to the degree of care and skill required of nurses in mal-

practice cases in Georgia. The Court therefore denies Defendants' Motion to Dismiss with respect to this count.

### D. Count Seven

Count seven of Plaintiffs' Complaint asserts a claim for third-party beneficiary breach of contract. Specifically, Plaintiffs allege that Defendants have breached the contract between NHC of Ft. Oglethorpe and the Georgia Department of Community Health.

Defendants argue that this claim should be dismissed because Plaintiffs have failed to exhaust their claims, Plaintiffs lack standing, and no private cause of action exists to enforce standards imposed under the Medicaid and Medicare Acts. Additionally, Defendants maintain that Plaintiffs' rights as third-party beneficiaries, if any, are governed by federal law. Because no private cause of action exists under the Medicaid Act, Defendants argue, Plaintiffs cannot sue as third-party beneficiaries. (Defs.' Mem. Supp. Mot. Dismiss at 14–15) (citing *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980)).[3] Lastly, Defendants contend that any claim for recoupment or repayment of Medicaid payments must be dismissed because such relief is not authorized under the applicable Medicaid statutes.[4]

For the reasons discussed *supra* Part II.A.3.a. and b., the Court rejects Defendants' first two arguments. Likewise, Defendants' argument that federal law governs Plaintiffs' third-party beneficiary claims is without merit.

In *Miree v. DeKalb County*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), victims of an airline crash brought a diver-

---

3. The only other controlling authority cited by Defendants, *Roberts v. Cameron–Brown Co.*, 556 F.2d 356 (5th Cir.1977), does not suggest that Plaintiffs may not sue as third-party beneficiaries. The former Fifth Circuit's opinion in *Roberts,* issued shortly after the Supreme Court decided *Miree,* concluded that the plaintiff in that case could not sue as a third-party beneficiary under a handbook published by the Department of Housing and Urban

Development. *Id.* at 362. The case does not address the type of contract at issue in this case.

4. Plaintiffs seek compensatory damages, not restitution or recoupment. (Compl. at 42–43; First Am. Compl. at 9.) The Court therefore denies as moot Defendants' Motion to Dismiss with respect to Plaintiffs' claims for restitution and recoupment.

sity action against the owner of an airport. *Id.* at 26, 97 S.Ct. 2490. The plaintiffs argued that they were third-party beneficiaries of a contract between the airport and the Federal Aviation Administration which obligated the airport to take certain precautions. *Id.* at 27, 97 S.Ct. 2490. The Supreme Court held that whether the plaintiffs were third-party beneficiaries was a matter of state, not federal, law. *Id.* at 29–33, 97 S.Ct. 2490.

The Supreme Court noted in *Miree* that only "the rights of private litigants [were] at issue." *Id.* at 30, 97 S.Ct. 2490; *cf. Holbrook v. Pitt,* 643 F.2d 1261, 1270 n. 16 (7th Cir.1981) (finding that federal common law applies when federal government is defendant). The Court also acknowledged the federal interest in regulation of air safety, but found that interest insufficient to require application of federal common law. Moreover, the Court noted that the plaintiffs' claims "involve[ ] this federal interest only insofar as such lawsuits might be thought to advance federal aviation policy by inducing compliance with FAA safety provisions." *Miree,* 433 U.S. at 32, 97 S.Ct. 2490. Finally, the Supreme Court concluded that the absence of any indication that Congress intended to displace state law supported its holding that state law governed the plaintiffs' entitlement to sue as third-party beneficiaries. *Id.* at 32, 97 S.Ct. 2490.

Like the parties in *Miree,* only private litigants are involved in this lawsuit. The Court also has found no indication that Congress intended to displace state law in this area. *See supra* Part II.A.4. Lastly, the Court finds that Plaintiffs' claims "will have no direct affect upon the United States or its Treasury," and implicate federal interests "only insofar as such lawsuits might be thought to advance federal ... policy by inducing compliance" with Medicaid participation requirements. *Miree,* 433 U.S. at 29, 32, 97 S.Ct. 2490. For these reasons, state law governs the issue

whether Plaintiffs may sue as third-party beneficiaries.

The Supreme Court's opinion in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), is inapposite. In *O'Bannon,* nursing home residents attempted to enjoin enforcement of Medicaid participation requirements by the Government. *Id.* at 775–77, 100 S.Ct. 2467. The question raised by the plaintiffs' claims was whether the residents had a constitutional right to a hearing before the Government decertified a long-term care facility for noncompliance with participation requirements. *Id.* at 784, 100 S.Ct. 2467. The Court concluded that the residents had no due process interest in the Government's decision to enforce participation requirements. *Id.* at 788–90, 100 S.Ct. 2467.

The Supreme Court in *O'Bannon* did not address the residents' potential claims against the facility. *Id.* at 790, 100 S.Ct. 2467 ("[W]e express no opinion on [the] subject" of legal rights residents may have against the facility). In other words, the evaluation of plaintiffs' rights under the Constitution does not speak to their rights under the contract—which is a question of state law.

 Similarly, the absence of an implied cause of action under the Medicaid and Medicare Acts does not determine whether Plaintiffs may sue as third-party beneficiaries pursuant to the contract at issue. The question is whether Plaintiffs may sue as third-party beneficiaries under the contract, *see Gardner & White Consulting Servs., Inc. v. Ray,* 222 Ga.App. 464, 466, 474 S.E.2d 663 (1996), not whether Congress intended to create a private cause of action in a statute. *Cf. Roberts,* 556 F.2d at 360–62 (addressing intentions of parties to alleged contract after determining that Congress did not intend to create private cause of action).[5] The Court therefore denies Defendants' Motion to Dismiss with respect to this argument.

---

**5.** Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209–11 (11th Cir. 1981) (en banc).

### E. Count Eight

Count eight of Plaintiffs' Complaint asserts a claim for breach of contract. Plaintiffs allege that Defendants have breached a contract executed by one or more Plaintiffs upon their admission to Defendants' long-term care facility. This contract is entitled, "Admission and Financial Contract TG 200" ("Admissions Contract"), and includes a provision that the facility will provide services "in accordance with licensure laws, certification requirements and standards of the industry." (Compl.Ex. B.)

Defendants argue that this count should be dismissed because Plaintiffs have failed to exhaust their claims, Plaintiffs lack standing, and no private cause of action exists to enforce standards imposed under the Medicaid and Medicare Acts. Additionally, Defendants argue that responsibility for evaluating and enforcing the quality of care provided to Plaintiffs is vested solely within "the provenance of the state." (Defs.' Mem. Supp. Mot. Dismiss at 17.) Defendants also contend that Plaintiffs have failed to satisfy a condition precedent contained within the contract, and ·that deceased Plaintiffs cannot sue under the Admissions contract.

For the reasons discussed *supra* Part II.A.3.a. and b., the Court rejects Defendants' first two arguments. Furthermore, the absence of an implied private cause of action under the Medicaid Act does not preclude Plaintiffs from suing for breach of contract—it means only that Plaintiffs' claim does not "arise under" the federal statute. *Merrell Dow Pharm., Inc. v. Thompson,* 478 U.S. 804, 817, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *City of Huntsville v. City of Madison,* 24 F.3d 169, 172–73 (11th Cir.1994). The Court also does not believe that Congress intended to preempt such claims. *See supra* Part II.A.4; 42 U.S.C.A. § 1396r(h)(8); *cf. New York Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) ("Where coordinate

state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.").

Defendants also argue that Plaintiffs have failed to comply with the dispute resolution procedure specified in the contract. Defendants contend · that this provision is a "condition precedent," the satisfaction of which must be alleged in Plaintiffs' Complaint before Plaintiffs may recover under the terms of the contract.

"A condition precedent is one which must be performed before any right to be created thereby accrues." *See Wolverine Ins. Co. v. Sorrough,* 122 Ga.App. 556, 560, 177 S.E.2d 819 (1970). Before the enactment of the Civil Practice Act, plaintiffs were required to allege the performance of a condition precedent when the plaintiff's right to recover depended upon performance of the condition by the plaintiff. *Id.*

Plaintiffs in Georgia need no longer do so. *See, e.g., Olympic Constr., Inc. v. Drywall Interiors, Inc.,* 180 Ga.App. 142, 144, 348 S.E.2d 688 (1986) ("Under the Civil Practice Act, it is no longer necessary for a plaintiff to allege performance or occurrence of a condition precedent in his complaint."); Fed.R.Civ.P. 9(c) ("it is sufficient to aver generally that all conditions precedent have been performed or have occurred"). The Court therefore denies Defendants' Motion to Dismiss with respect to this argument.

Finally, Defendants argue that deceased Plaintiffs have no cause of action under the Admissions Contract. Defendants maintain that the contract is one for personal services, is not assignable, and therefore does not survive the death of parties to the contract.

The claims of deceased Plaintiffs for damages under the contract survive Plaintiffs' death. *Elliott v. Cline,* 184 Ga. 393, 395, 191 S.E. 372 (1937).[6] The Court

---

**6.** As the Court noted at the hearing, deceased Plaintiffs have no claim for injunctive relief.

therefore denies Defendants' Motion to Dismiss with respect to this argument.

## F. Count Nine

Count nine of Plaintiffs' Complaint asserts a claim pursuant to the Fair Business Practices Act of 1975 ("FBPA"), O.C.G.A. § 10–1–390 to –407. Defendants argue that this statute is simply a "gap filling" statute, and does not provide a cause of action when adequate administrative or legal remedies exist. Defendants also argue that deceased Plaintiffs may not assert claims under this statute.

For the reasons discussed *supra* Part II.B., the Court rejects Defendants' latter argument. Nonetheless, the Court grants Defendants' Motion to Dismiss with respect to count nine of Plaintiffs' initial Complaint.

The FBPA is designed to "protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state." § 10–1–391. Stated differently, "[t]he purpose of the Georgia FBPA is to protect consumers against that limited class in conduct of consumer transactions and consumer acts or practices in trade or commerce which involve 'unfair and deceptive practices' within the consumer marketplace." *Chancellor v. Gateway Lincoln–Mercury, Inc.*, 233 Ga. App. 38, 43, 502 S.E.2d 799 (1998). Under Georgia law, individuals who violate the FBPA are subject to additional civil penalties if the violation is committed against elder or disabled persons. § 10–1–851.

■ The FBPA does not apply to "[a]ctions or transactions specifically authorized under laws administered by or rules and regulations promulgated by any regulatory agency of this state or the United States." § 10–1–396(1). Indeed, the legislature "intended that the Georgia FBPA have a restricted application only to the unregulated consumer marketplace

and that the FBPA not apply in regulated areas of activity, because regulatory agencies provide protection or the ability to protect against the known evils in the area of the agency's expertise." *Chancellor*, 233 Ga.App. at 45, 502 S.E.2d 799. Accordingly, the FBPA does not apply in extensively regulated areas of the marketplace such as investment account transactions, finance charges and required disclosures by lenders, and insurance transactions. *Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667, 675 (N.D.Ga.1983) (holding allegations of unauthorized trades or churning not cognizable under FBPA); *Chancellor*, 233 Ga.App. at 45, 502 S.E.2d 799 ("area of finance charges, disclosure, and truth in lending falls outside the FBPA, except where expressly covered"); *Ferguson v. United Ins. Co. of Am.*, 163 Ga.App. 282, 283, 293 S.E.2d 736 (1982) ("[I]nsurance transactions are among those types of transactions which are exempt from the Fair Business Practices Act.").

■ Plaintiffs argue that the FBPA provides a cause of action with respect to any public consumer transaction in which no other regulatory scheme addresses unfair or deceptive practices. (Pls.' Br. Opp'n Defs.' Mot. Dismiss at 30.) Because neither federal nor state law address deceptive practices in the nursing home industry, Plaintiffs contend that the FBPA encompasses Plaintiffs' claims.

Under the circumstances of this case, the Court disagrees with Plaintiffs' argument. Plaintiffs' Complaint contains allegations about a singular concern: the deficient level of care provided by Defendants to Plaintiffs. Because Defendants' long-term care facility participates in the Medicare and Medicaid programs, the degree of care provided to Plaintiffs is regulated by state and federal agencies.[7] *See supra* Part II.A.1. and 2. In other words, federal and state agencies regulate the precise

---

*Elliott,* 184 Ga. at 395, 191 S.E. 372.

**7.** The Court expresses no opinion whether FBPA might encompass claims against a

long-term care facility that did not participate in the Medicare or Medicaid programs.

conduct about which Plaintiffs complain. *See Taylor,* 572 F.Supp. at 674 (construing FBPA as excluding "conduct that is being regulated by an administrative agency"); *Chancellor,* 233 Ga.App. at 45, 502 S.E.2d 799 (finding that FBPA does not apply when regulatory agencies "provide protection or the ability to protect against the known evils in the area of the agency's expertise").

Furthermore, the most recent decision by the Georgia Court of Appeals construing the FBPA observes that the General Assembly intended the FBPA to have a *"restricted application* only to the unregulated consumer marketplace." *Chancellor,* 233 Ga.App. at 45, 502 S.E.2d 799 (emphasis added). The Court thus does not believe that the scope of the FBPA is as wide as Plaintiffs contend. In any case, because the degree of care provided by long-term care facilities to their residents is heavily regulated, the Court concludes that the FBPA does not encompass Plaintiffs' claims. The Court therefore grants Defendants' Motion to Dismiss with respect to count nine of Plaintiffs' initial Complaint.

### G. Counts Eleven and Twelve

In counts eleven and twelve of their initial Complaint, Plaintiffs request injunctive and declaratory relief. Defendants argue that such relief is not available to Plaintiffs who are deceased, adequate remedies at law exist, state and federal agencies have primary jurisdiction with respect to Plaintiffs' claims, and Plaintiffs lack standing.

Plaintiffs agree with Defendants that claims for injunctive or declaratory relief by Plaintiffs who are deceased have abated with the Plaintiffs' death. (Pls.' Br. Opp'n Defs.' Mot. Dismiss at 34.) The Court therefore grants Defendants' Motion to Dismiss claims for injunctive or declaratory relief by deceased Plaintiffs. The Court disagrees with Defendants' arguments concerning standing and primary jurisdiction for the reasons stated *supra* Part II.A.3.a. and b.

The Court also rejects Defendants' argument that injunctive relief is unavailable. Plaintiffs' Complaint alleges conduct that continues to pose a serious threat to the health and welfare of Plaintiffs. Upon appropriate proof, Plaintiffs therefore may be entitled to injunctive relief. O.C.G.A. § 9–5–1; *see also Robinson v. Landings Ass'n, Inc.,* 264 Ga. 24, 26, 440 S.E.2d 198 (1994) (noting that pleadings alleging that defendants were committing or threatening to commit torts against plaintiffs sufficient to withstand motion to dismiss); *cf. Pompey v. Broward County,* 95 F.3d 1543, 1554 (11th Cir.1996) (injunctive relief available when no adequate remedy exists and threatened injury is irreparable); *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990) (injury is deemed to be "irreparable" if it cannot be undone through monetary remedies); *Parks v. Dunlop,* 517 F.2d 785, 787 (5th Cir.1975) (same). The Court therefore denies Defendants' Motion to Dismiss with respect to the surviving Plaintiffs' claims under counts eleven and twelve of Plaintiffs' initial Complaint.

### III. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss [12]. The Court **GRANTS** Defendants' Motion to Dismiss with respect to counts one, two, and nine of Plaintiffs' initial Complaint. The Court also dismisses the claims for injunctive or declaratory relief by Plaintiffs who are deceased. The Court **DENIES** the balance of Defendants' Motion to Dismiss.

### *ORDER MODIFYING OPINION ON DENIAL OF RECONSIDERATION*

This case involves federal and state law claims by present and deceased residents of a long-term health care facility alleging that Defendants have failed to provide basic and minimally required levels of care. The case is before the Court on Defendants' Motion for Reconsideration [58].

### I. Standard Applied to Motion for Reconsideration

The Federal Rules of Civil Procedure do not mention motions for reconsideration. Rule 59(e), however, provides for motions to alter or amend a judgment filed within ten days of the judgment. Fed.R.Civ.P. 59(e). A party may also seek relief from a final judgment pursuant to the relatively strict provisions of Rule 60(b). Fed. R.Civ.P. 60(b). Furthermore, the Court may modify or vacate non-final orders at any point prior to final judgment. Fed. R.Civ.P. 54(b); *see also Bon Air Hotel Inc. v. Time, Inc.*, 426 F.2d 858, 862 (5th Cir. 1970).[1]

■■■ A motion for reconsideration seeks to invoke a district court's authority to modify or vacate its prior orders. Such a motion, however, "shall not be filed as a matter of routine practice." N.D. Ga. L.R. 7.2(E). Indeed, even in the case of a non-final order, the Court must balance its duty to render just decisions with the need for finality. *McCoy v. Macon Water Auth.*, 966 F.Supp. 1209, 1222 (S.D.Ga. 1997). Parties therefore may not employ a motion for reconsideration as a vehicle to present new arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar arguments to test whether the Court will change its mind. *Id.* at 1223; *Paper Recycling v. Amoco Oil Co.*, 856 F.Supp. 671, 678 (N.D.Ga.1993). With the foregoing principles in mind, the Court addresses Defendants' Motion for Reconsideration.

### II. Discussion

#### A. Jurisdiction For Claims "Arising Under" the Medicare Act

Defendants once again argue that Plaintiffs' claims under the Medicare and Medicaid Acts are barred by the removal of federal question jurisdiction contained in 42 U.S.C.A. § 405. The Court understood this argument the first time it was asserted, and finds it no more persuasive now. Indeed, the argument is both moot—because the Court dismissed Plaintiffs' claims under the Medicare Act—and without merit. The removal of federal question jurisdiction for claims "arising under" the Medicare Act does not apply to Plaintiffs' claims against a private party for violations of participation requirements wholly unrelated to Medicare eligibility or benefit determinations. *See* 42 U.S.C.A. § 405(h) ("No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."); *United States v. Blue Cross and Blue Shield of Ala., Inc.*, 156 F.3d 1098, 1110 (11th Cir.1998) ("We are not faced with a claim for benefits from a dissatisfied Medicare beneficiary, nor are we faced with a claim cognizable within the administrative framework provided in section 405."). The Court therefore denies Defendants' Motion for Reconsideration with respect to this argument.

#### B. Preemption

Defendants also contend that Plaintiffs' claims for professional malpractice, third-party beneficiary breach of contract, and breach of contract are preempted by federal law. Defendants cite *Geier v. American Honda Motor Co.*, —— U.S. ——, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), and *Howard v. Uniroyal, Inc.*, 719 F.2d 1552 (11th Cir.1983), in support of this argument.

■■■ The legal principles announced in *Geier* are not new to the Eleventh Circuit, or any other federal circuit for that matter. *See* 120 S.Ct. at 1917; *Taylor v. General Motors Corp.*, 875 F.2d 816, 826 (11th Cir.1989).[2] Indeed, Defendants' reli-

---

**1.** Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. *See Bonner v. City of* *Prichard,* 661 F.2d 1206, 1209–11 (11th Cir. 1981) (en banc).

**2.** Although previously abrogated, *Taylor* was rehabilitated by the Court of Appeals for the

ance upon *Howard* illustrates that Defendants' preemption argument was plainly available to Defendants previously, and thus does not provide a proper ground for relief in a motion for reconsideration. The Court therefore denies Defendants' Motion for Reconsideration with respect to this argument. Alternatively, the Court finds Defendants' argument unpersuasive.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Pursuant to the Supremacy Clause, federal legislation may preempt state law. *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

The Court doubts that the Supremacy Clause applies to the regulatory scheme promulgated under the Medicare and Medicaid Acts. Enacted pursuant to Congress' spending power, these programs restrict federal funds to encourage compliance with federal standards for participating in the programs. (Order of May 17, 2000, at 19–22.) "[L]egislation enacted pursuant to the spending power is much in the nature of a contract .... The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' " *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

■ State laws that require standards of care different from those imposed under Medicaid and Medicare do not become void once a State agrees to receive federal funds. For example, if Congress restricted disbursement of federal funds based upon the enactment of certain state measures to combat violence against women, the federal standards for disbursement of funds and scheme of enforcement would not preempt other state laws designed to combat violence against women. Such a

conclusion would suggest that federal law is supreme in an area in which Congress lacks an enumerated power to legislate. *Cf. United States v. Morrison,* —— U.S. ——, ——, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000) ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.").

To be sure, the States must comply with Medicaid and Medicare participation requirements in order to continue to receive federal funds. But the authority to require compliance with participation standards is derived not from the primacy of federal law enacted pursuant to an enumerated power but from the terms of a contract and the agreement to abide by those terms in return for the receipt of federal moneys. *See Pennhurst,* 451 U.S. at 17, 101 S.Ct. 1531.

Alternatively, the Court finds that federal law under the Medicaid and Medicare Acts does not preempt Plaintiffs' claims. Conceding that the Medicaid and Medicare Acts do not expressly preempt state law, Defendants argue that these programs both occupy the field of regulation of nursing homes and conflict with state common law causes of action.

■ Federal preemption of state law can occur in three circumstances: (1) express preemption where Congress explicitly preempts state law; (2) implied preemption where Congress has occupied the entire field (field preemption); and (3) implied preemption where there is an actual conflict between federal and state law (conflict preemption). *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). "Field preemption occurs when Congress regulates a field so pervasively or passes a law that touches on a field implicating a dominant federal interest that an intent to preempt state law can be inferred." *American*

Eleventh Circuit. *Irving v. Mazda Motor Corp.,* 136 F.3d 764, 767 n. 1 (11th Cir.1998)

("*Taylor* is correct and can be used for evaluating preemption of state law.").

*Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.,* 182 F.3d 1284, 1287–88 (11th Cir. 1999). The comprehensive nature of a federal regulatory scheme, however, is not sufficient to support the conclusion that Congress intends to preempt all state regulation. *See Hillsborough County v. Automated Med. Lab. Inc.,* 471 U.S. 707, 717, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) ("To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence").

█ Conflict preemption occurs "where it is impossible for a private party to comply with both state and federal requirements, ... or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English,* 496 U.S. at 79, 110 S.Ct. 2270 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)) (citations omitted); *see also Taylor,* 875 F.2d at 826 ("[F]ederal law nevertheless [impliedly] preempts the state law to the extent that the ordinary application of the two laws creates a conflict."). In *Geier,* the Supreme Court held that the National Traffic and Motor Vehicle Safety Act ("the Safety Act"), 49 U.S.C.A. §§ 30101 to 30169, preempted a tort claim based upon the failure to equip an automobile with an airbag because the Safety Act authorized and was designed to encourage manufacturers to install a range of safety devices. 120 S.Ct. at 1925; *see also Irving v. Mazda Motor Corp.,* 136 F.3d 764, 769 (11th Cir.1998) (concluding that the Safety Act impliedly preempted lawsuits attempting to impose liability "for exercising an option explicitly permitted by Congress").

## 1. Negligence and Breach of Contract Claims

As an initial matter, the Court observes that healthcare is traditionally a subject of state regulation. (Order of May 17, 2000, at 22–23.) Particularly in an area such as medical care, an archetypal local interest, the Court will not infer a congressional intent to preempt state regulation absent strong evidence of such intent. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *Hillsborough County,* 471 U.S. at 719, 105 S.Ct. 2371; *New York Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). The Court finds no such evidence in this case with respect to the level of care provided by participating nursing homes.

Medicaid is a joint federal and state program designed to afford medical benefits to low-income individuals. (Order of May 17, 2000, at 7.) The Medicaid program explicitly contemplates regulations promulgated by States. 42 U.S.C.A. § 1396a(a)(9); *cf.* O.C.G.A. § 49–4–142(a) (authorizing Department of Medical Assistance to establish rules and regulations to implement Georgia's Medicaid plan). In fact, a State is free to impose Medicaid requirements that exceed those required in other States. 42 U.S.C.A. § 1395z. These heightened requirements must also apply to participants in the Medicare program in that State. *Id.*

Consequently, "instead of comprehensively preempting state law, the [Medicaid and Medicare programs] 'seem[ ] to contemplate state law action.'" *Boyes v. Shell Oil Prods., Co.,* 199 F.3d 1260, 1267 (11th Cir.2000) (discussing Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.A. §§ 6901–6992) (quoting *Feikema v. Texaco, Inc.,* 16 F.3d 1408, 1413 (4th Cir.1994)); *cf. New York Dept. of Social Servs.,* 413 U.S. at 421, 93 S.Ct. 2507 ("Where coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one."). The Court thus finds that Congress did

not intend to displace state laws regulating nursing home care.

The Court also believes that Plaintiffs' negligence and breach of contract causes of action do not conflict with federal law. Defendants assert that the standard of care applied under a state negligence claim is in "direct conflict" with the participation requirement that nursing homes provide sufficient care "to attain or maintain the highest practicable physical, mental, and psychosocial well-being" of their residents. 42 C.F.R. § 483.25. While perhaps different, these standards do not pose mutually exclusive choices for nursing homes that receive money under the Medicare and Medicaid programs. *See English,* 496 U.S. at 78–79, 110 S.Ct. 2270 (noting that implied preemption occurs when "it is impossible for a private party to comply with both state and federal requirements"). Indeed, Defendants fail to explain why a nursing home and its employees cannot comply with the ordinary standard of due care while striving to adequately provide for the mental, physical, and social needs of the residents.

Defendants contend, however, that if Plaintiffs' claims incorporate federal participation requirements, Defendants would face "the impossible position of being subject to liability for negligence and breach of contract based on a jury's interpretation of those very same regulatory standards" used by state surveyors. Assuming that Plaintiffs' breach of contract and negligence causes of action incorporate federal Medicaid and Medicare participation requirements, the Court rejects Defendants' argument.

If the state and federal standards are in fact identical (rather than different as Defendants argue above), Defendants' certification by state surveyors would provide some evidence that Defendants have not breached Plaintiffs' contracts or violated the applicable standard of care. *Cf. Evelyn V. v. Kings County Hosp. Ctr.,* 819 F.Supp. 183, 189–90 (E.D.N.Y.1993) ("accreditation serves only as 'prima facie' evidence of compliance with Medicaid stan-

dards"). Moreover, this argument does not suggest that Plaintiffs' state law causes of action conflict with the implementation of the Medicaid or Medicare programs. In fact, if the standard of care required by Plaintiffs' claims is no different than that required by federal law, it cannot be impossible to comply with both standards.

Finally, Defendants argue that Plaintiffs' claims would hinder the promotion of uniform nationwide participation standards. Because States promulgate their own individualized plans to comply with Medicaid participation requirements, the Court rejects Defendants' argument. The Court also notes that Congress amended the Medicaid and Medicare Acts in the Federal Nursing Home Reform Act ("FNHRA") "to improve the quality of care for Medicaid-eligible nursing home residents." (Order of May 17, 2000) (quoting H.R.Rep. No. 100–391, at 452 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–272). "In the face of this clear declaration of congressional purpose, [the Court is] unwilling to accept an overly broad notion of preemption based on uniformity that could have the effect of undercutting Congress's concern . . . ." *Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1122 (3d Cir. 1990).

### 2. Third–Party Beneficiary Breach of Contract

Defendants also argue that federal law preempts Plaintiffs' claims as third-party beneficiaries because of a pervasive administrative enforcement scheme. (Defs.' Mot. Recons. at 9–10) (citing 42 C.F.R. §§ 488.332, 488.335; O.C.G.A. § 31–8–80.) In support, Defendants principally rely upon *Howard v. Uniroyal, Inc.,* 719 F.2d 1552 (11th Cir.1983).

In *Howard,* the plaintiff attempted to sue as a third-party beneficiary of Section 503 of the Rehabilitation Act of 1973. *Id.* at 1553. Section 503 required at the time that any contract with a federal department or agency in excess of $2,500.00 was required to contain an affirmative action provision promoting the employment of

"qualified handicapped individuals." *See* 29 U.S.C.A. § 793(a) (1982).[3] The provision also provides an administrative enforcement provision which allows individuals with disabilities to file complaints with the Department of Labor. § 793(b).

The court of appeals determined in *Howard* that Congress occupied the field with respect to remedies for failure to comply with the affirmative action provision. 719 F.2d at 1559–60. Specifically, the court found that section 503 contained a comprehensive and pervasive enforcement scheme in an area of uniquely federal concern: federal contracts with private contractors. *Id.* at 1560. The court of appeals noted the federal concern with uniformity and concluded that the state interest in enforcing contracts could not exceed the federal government's, because a "state's interest in enforcing a federal contract is no greater than the federal interest." *Id.*

On the other hand, the federal interest in enforcing a state contract is likely no greater than the state interest. A review of count seven of Plaintiffs' initial Complaint reveals that Plaintiffs seek to sue as third-party beneficiaries of the contract between the Georgia Department of Community Health, Division of Medical Assistance, and Defendants to provide skilled nursing care, treatment, and other Medicaid services to Plaintiffs. (Pls.' Initial Compl. ¶ 147); (Order of May 17, 2000, at 25–26.) Because this contract is between a State agency and a private party, the Court does not believe that federal law could preempt an attempt to enforce the agreement by an ostensible third-party beneficiary.

Furthermore, the Court believes that the scheme of federal regulation is not so pervasive that Congress left no room for state action; in fact, the contract at issue appears to be an example of state action. In any case, unlike the circumstances in *Howard*, the subject matter of the contract is not a matter of peculiarly federal concern.

Lastly, the administrative scheme cited by Defendants is state, not federal, legislation. O.C.G.A. §§ 31–8–80 to 31–8–88. In contrast, Congress was the author of the administrative enforcement scheme at issue in *Howard*. 719 F.2d at 1561. In short, there is little question that federal law does not preempt state law in this case.

## C. Federalism and State Standards of Due Care

Count five of Plaintiffs' initial Complaint alleges a claim for professional malpractice. In the May 17, 2000, Order, the Court noted that "[p]articipation requirements under Medicare and Medicaid are relevant [to this cause of action], of course, only to the extent that they relate to the degree of care and skill required of nurses in malpractice cases in Georgia." (Order of May 17, 2000, at 25.) Defendants contend that if the standard of care applied to Plaintiffs' professional malpractice claim includes "federal professional nursing standards," Plaintiffs' claim would somehow implicate the principles of federalism recently defended by the Supreme Court in *United States v. Morrison*, —— U.S. ——, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

The Court's May 17, 2000, Order makes clear that Plaintiffs' malpractice claims do not serve as private causes of action to enforce Medicare or Medicaid participation requirements. To the extent Defendants argue that incorporation of federal standards or regulations in Georgia's professional standard of care would violate principles of federalism, however, this argument is altogether without merit and, in fact, contradicts Defendants' preemption argument.

The Legislature and courts of the State of Georgia are empowered to determine

---

**3.** The provision was amended to require contracts to include a provision promoting employment of "qualified individuals with disabilities." 29 U.S.C.A. § 793(a) (1992).

applicable professional standards of care within this State. If these standards of care reflect or incorporate federal Medicaid and Medicare participation requirements—or even the standard of care applied in a foreign country—neither the principle of federalism nor the principle that foreign governments cannot legislate for the citizens of the State of Georgia are offended. In other words, the content of the applicable standard of care is simply a matter of state law. The fact that Congress may not have the power to legislate in this area is irrelevant. Further, if Congress has no enumerated power by which to legislate in this area, as Defendants argue, federal compliance standards under the Medicare and Medicaid programs could not preempt state laws. In sum, the Court rejects the idea that any valid state law could contravene restrictions on the federal power to legislate. The Court therefore denies Defendants' Motion for Reconsideration with respect to this argument.

### D. Count VII

As noted above, count seven of Plaintiff's initial Complaint states a claim for third-party beneficiary breach of contract. Defendants argue that this claim should be dismissed because Plaintiffs are not third-party beneficiaries under Georgia law. This argument, although available at the time that Defendants filed their initial Motion to Dismiss, was not made at that time. It may not be asserted for the first time in a motion for reconsideration. Moreover, Defendants simply dispute the remedies available to Plaintiffs as third-party beneficiaries, rather than Plaintiffs' ability to sue as third-party beneficiaries. The Court therefore denies Defendants' Motion for Reconsideration with respect to this argument.

### E. Primary Jurisdiction

Defendants have not sought reconsideration of the Court's Order with respect to the issue of primary jurisdiction. Nonetheless, upon further reflection, the Court modifies the Court's May 17, 2000, Order in accordance with the following discussion.

■ Georgia provides an administrative complaint procedure to investigate complaints regarding the care and treatment provided by long-term health care providers. Long–Term Care Ombudsman Program, O.C.G.A. §§ 31–8–50 to 31–8–63; Long–Term Care Facility Resident Abuse Reporting Act, O.C.G.A. §§ 31–8–80 to 31–8–88. In the context of cases involving state administrative schemes, primary jurisdiction and Burford abstention are two names for the same thing. *Boyes,* 199 F.3d at 1266. Abstention under *Burford* is appropriate when the exercise of federal jurisdiction over the case at bar and similar cases would disrupt a state's efforts to implement uniform policy through a complex regulatory scheme involving an area of local concern. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Burford v. Sun Oil Co.,* 319 U.S. 315, 332–33, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

■ Plaintiffs' claims require the measurement of Defendants' conduct against the duties imposed by tort law, contract, and the Bill of Rights for Residents of Long–Term Care Facilities ("Long–Term Care Bill of Rights"). In other words, Plaintiffs' claims do not arise from any state administrative proceeding or regulatory ruling. The Court also does not believe that adjudication of Plaintiffs' claims in federal court will intrude on Georgia's administrative scheme for reviewing complaints regarding nursing home care. Indeed, state courts in Georgia have shown no reluctance to address malpractice cases involving nursing homes. (Order of May 17, 2000, at 25.) Moreover, the Georgia legislature expressly did not require nursing home residents to exhaust administrative remedies before filing an action under the Bill of Rights for Residents of Long–Term Care Facilities. O.C.G.A. § 31–8–126. To the extent that these causes of action implicate standards of care ad-

dressed by a state administrative body, the State therefore has not established a need for uniform regulation in this area. In sum, the state grievance procedure is not the sort of comprehensive regulatory system that would warrant application of *Burford* abstention. The Court thus concludes that federal jurisdiction in this case will not disrupt the state's system of reviewing complaints concerning nursing home care. *See Rindley v. Gallagher*, 929 F.2d 1552, 1557 (11th Cir.1991).

### III. Conclusion

ACCORDINGLY, the Court **DENIES** Defendants' Motion for Reconsideration [58], and **MODIFIES** the Court's May 17, 2000, Order with respect to the issue of primary jurisdiction.